GARTH, Circuit Judge,
dissenting:
I find it difficult to understand how the majority opinion can overlook the magnitude of Sel-Leb’s overstatement of earnings ($1.8 million) which was 400% below its reported income in 2001. Moreover, I find it even more difficult to understand how the majority opinion can overlook Sel-Leb’s failure to disclose Merrill Lynch’s significant modifications to Sel-Leb’s credit agreement because of Sel-Leb’s precarious financial condition. The majority opinion does so by characterizing Sel-Leb’s rosy projections about its financial health and future growth as “puffery.” I cannot *788 join in the majority’s “puffery” analysis and I therefore respectfully dissent.
I.
The facts alleged in the complaint, taken together with Sel-Leb’s SEC filings which we are permitted to consider on a motion under Rule 12(b)(6),[13] are more than sufficient to plead and satisfy a “strong inference” that the director defendants acted fraudulently and with scienter as required under the Private Securities Litigation Reform Act of 1995 (“PSLRA”).[14]
First, Merrill Lynch’s repeated material modifications of Sel-Leb’s loan agreements in mid-2002 strongly point to the fact that Merrill Lynch was seriously concerned about Sel-Leb’s financial position.[15] I find it rather quixotic that in its effort to minimize Sel-Leb’s intent to commit fraud, the majority opinion recites in its footnote 11—and without the context, language, and facts found in paragraph 30 of the complaint—that Sel-Leb’s renegotiation of its credit line was no more than in the “ordinary course of business.” The majority opinion’s footnote 11 states:
... The complaint states only that, on information and belief, Sel-Leb had to renegotiate its credit line because it could not repay certain obligations to Merrill Lynch. (A53) With this allegation alone, an inference that defendants renegotiated Sel-Leb’s credit line in the ordinary course of business (when it was up for renewal) is more likely than an inference of scienter. See Tellabs, 127 S.Ct. at 2513.
However, paragraph 30 of the complaint in which the majority opinion finds comfort—in full alleges not just the last sentence cited by the majority—but rather those facts and details giving rise to the renegotiation of the credit agreement. Paragraph 30 of the complaint alleges that:
*789 This disclosure [that fourth quarter 2002 sales would be substantially lower than projected] occurred shortly after defendants filed their quarterly report for the third quarter of 2002. Buried in the quarterly report was the disclosure that Sel-Leb had been required to renegotiate the terms of a $3.8 million credit facility with Merrill Lynch Business Financial Services, Inc. (“Merrill Lynch”) and to postpone its obligation to repay the $3,717,249 outstanding balance on the credit facility from October 31, 2002 to October 31, 2003. Upon information and belief, the Company had to renegotiate the terms of the credit facility with Merrill Lynch because it could not make the payment as required on October 31, 2002.
These concerns obviously caused Merrill Lynch problems. Despite these troubling concerns of Sel-Leb’s principal lender, the director defendants reported in a November 18, 2002 press release that Sel-Leb was merely “pleased to announce” that it was “renewing [not renegotiating] our Operating Line of Credit.” A42 (emphasis added). From the entire allegations (not just the last sentence) contained in paragraph 30 of the complaint, it appears that the director defendants had actual knowledge, to a far greater degree than they disclosed, of Sel-Leb’s troubled financial position.
Second, the sheer size of Sel-Leb’s overstatements—over 400% of earnings in fiscal year 2001 alone—are indicative of fraudulent intent. The complaint alleges that without these enormous overstatements of earnings (which actually were losses, not positive income), Sel-Leb would have breached and defaulted on the terms of its credit agreement, causing Merrill Lynch to terminate its credit at once and “exercis[e] remedies available to it as a secured lender.” Comp. 111144-45. Would reasonable investors truly regard a misstatement of over 400% of reported income as mere “puffery?” Nor is it an answer to say that the 400% overstatement of earnings have been miscalculated as the majority claims in its footnote 12.
The majority opinion’s hypothesis (evaluating the extent of revenues and expenses) as to the source of the misstatement—“a decrease of about 10%” of revenues—is nothing more than pure speculation since neither the record nor the SEC filings state the reason for the 400% overstatement of earnings.[16] All the record and the SEC filings reveal is that SelLeb turned from a profitable venture into a bankrupt company because, in part, its 2001 earnings were overstated by 400%. See A50; Sel-Leb Form 8-K, filed Feb. 24, 2004. To a reasonable investor, it is inconsequential whether such a significant misstatement of earnings retained by shareholders arises from an overstatement of revenues and/or an understatement of expenses.
The SEC documents and reports, which the majority opinion has taken pains not to address, disclose that Sel-Leb was not a “barely unprofitable company” (see maj. op. n. 12) but was rather in deep financial trouble—trouble which it chose not to disclose to its investors or to Merrill Lynch. Moreover, by affirming the erroneous dismissal of Key Equity’s complaint the majority has now precluded Key Equity from providing by proofs the further facts and details as to Sel-Leb’s losses and its fraud.
*790 Finally, the need to falsify Sel-Leb’s asset statements in order to prevent a default leading to an end of its crucial credit line constitutes a motive to commit fraud that is probative of scienter. In this regard, the complaint alleges that “[d]efendants were motivated to issue materially false statements ... in large part to maintain the credit facility with Merrill Lynch. Had Merrill Lynch discovered the adverse information about the Company earlier, it would have called for termination of the credit facility immediately.” Comp. 1f 45. Such motivation provides further probative support for plaintiffs’ assertion that the director defendants acted with fraudulent intent.
These allegations, separately and particularly in combination, adequately plead a “strong inference” of scienter as required by the PSLRA.
II.
The majority opinion states that Key Equity’s allegations in its complaint have not been adequately pled and are “bereft of any facts or details supporting” the conclusion that Sel-Leb concealed its financial condition to maintain its credit line. Maj. op. p. 786. Let’s examine what Key Equity really and factually charged.

Sel-Leb’s Failure to Disclose Modiñcations of its Credit Agreement

Sel-Leb’s Form 10-KSB contained, as an attachment, a loan agreement dated November 8, 1999, under which Merrill Lynch agreed to provide a revolving line of credit to Sel-Leb. One of the covenants contained in this loan agreement, under the heading “Minimum Tangible Net Worth,” required that “Customer’s ‘tangible net worth’ shall at all times exceed $6,500,000.00.” A27. In 2002, amidst Sel-Leb’s now evident catastrophic losses, Merrill Lynch modified the loan agreement two times. On June 6, 2002, Merrill Lynch increased the tangible net worth requirement to $8 million. A28. Just four months later, on October 18, 2002, the tangible net worth requirement was further increased to $8.5 million. A29.
Sel-Leb did not report either of these modifications in its subsequent August 15, 2002 or September 13, 2002 press releases that accompanied its second quarter 2002 or third quarter 2002 financial reports. Finally, in a November 18, 2002 press release, Sel-Leb cheerfully reported that it was “pleased to announce that we have signed an agreement with our major lending institution, renewing our Operating Line of Credit through October 31, 2003.” A42 (emphasis added). This announcement made no mention of nor did it contain any indication of the changes to Sel-Leb’s loan agreement. Moreover, the very term “renewing” used by Sel-Leb to characterize the modifications to its loan agreement was itself misleading and fraudulent. The complaint alleges that this was not a renewal but at best a significant renegotiation. Comp. If 30. (Puffery?).
The November 18, 2002 press release also reported positive earnings for the nine months ended September 30, 2002, and stated “we expect to continue to show growth in both sales and earnings for the fiscal year 2002.” Id. It was only later that Sel-Leb disclosed that it had sustained a $3.8 million loss for fiscal year 2002. Comp. Iff 39^40.
The allegations containing and referring to these facts demonstrate that the director defendants had actual knowledge or at the very least behaved recklessly with respect to Sel-Leb’s deteriorating financial condition. Merrill Lynch’s fears—as expressed by its decisions to twice modify Sel-Leb’s loan covenants—were obvious warnings putting the director defendants *791 on notice of Sel-Leb’s seriously unstable financial condition. Even more revealing of the director defendants’ state of mind, however, is the misleading manner by which Sel-Leb reported the extension of its credit facility—i.e., that it was “pleased” to be “renewing” the facility— without so much as a hint that in fact Merrill Lynch had twice within the last five months materially tightened the terms of Sel-Leb’s credit. Comp. 111130, 36, 45, 54. These allegations and facts are alone sufficient to create a strong inference of scienter permitting this case to go forward.
The director defendants argue that “the reason why Sel-Leb had to renegotiate the terms of the credit facility on October 31, 2002 ... was because October 31 st was the annual date for renewal of the credit facility.” Def. Br. at 23. This still fails to explain why the materially adverse renegotiated terms were not disclosed. Instead, the director defendants whitewashed those changes with a report that Sel-Leb’s credit facility had merely been “renew[ed].” Comp. 1130. In any event, the issue whether the October 31, 2002 extension was simply an annual renewal or, as Key Equity maintains, “a renegotia[tion] ... because [Sel-Leb] could not make the payment as required on October 31, 2002” is a matter for discovery, not resolution on a motion under Rule 12(b)(6). Id. The allegations amply reveal that the actions of the director defendants were not the result of unfortunate business conditions, but were rather fraudulent efforts to disguise Sel-Leb’s failing enterprise.
III.

Size of Misstatements and Errors in Financial Reports

The inference of scienter here is further heightened by the sizable magnitude of the overstatements in Sel-Leb’s 2001 and 2002 financial statements. According to the complaint, Sel-Leb’s pre-tax earnings for fiscal year 2001 were overstated by $1.8 million, and were thus actually over 400% below Sel-Leb’s $443,669 reported 2001 income. Comp. HIT 41, 44. And, while reporting positive pre-tax income of $339,000 for first quarter 2002 and positive, though declining, pre-tax income of $418,370, and $132,276 for the six and nine month periods ending June 30, 2002 and September 30, 2002, Sel-Leb later admitted no income for those periods but rather a $3.8 million loss for fiscal year 2002. Comp. 111124, 26, 40, 44. These facts can hardly be called “puffery” or a vague and general statement of optimism (maj. op. p. 785-86) or forward-looking (maj. op. n. 8).
The magnitude of the overstatements in corporate financial statements has repeatedly been held to constitute corroborating circumstances of fraudulent intent. See Gen. Elec. Capital Corp. v. Acosta (In re Acosta), 406 F.3d 367, 372 (5th Cir.2005) (“An intent to deceive may be inferred from ‘reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation. ’ ”) (emphasis added); PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 684 (6th Cir.2004) (“[A]n inference of knowledge or recklessness may be drawn from allegations of accounting violations that are so simple, basic, and pervasive in nature, and so great in magnitude, that they should have been obvious to a defendant.”) (emphasis added); In re MicroStrategy, Inc. Sec. Litig., 115 F.Supp.2d 620, 637 (D.Va.2000) (“[T]he ... restatements are of such a great magnitude—amounting to a night-and-day difference with regard to MicroStrategy’s representations of profitability—as to compel an inference that fraud or recklessness was afoot.”) (emphasis added).[17]
*792 Here, Sel-Leb overstated its earnings by over 400% in 2001 and reported hundreds of thousands of dollars in earnings in 2002 while in reality sustaining a massive $3.8 million loss. The enormity of these overstatements, taken together with the serious consequences the director defendants knew would result from a disclosure that Sel-Leb breached the covenants in its credit facility, are prime indicia of scienter under the PSLRA and Rule 9(b).
rv.
We have held that scienter may be adequately pleaded either (1) by “alleging facts establishing a motive and an opportunity to commit fraud;” or (2) by “setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior.” In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534-35 (3d Cir.1999). As discussed above, the plaintiffs here have alleged “conscious behavior” in that the director defendants knew of Merrill Lynch’s concerns and concealed those concerns by reporting merely that Sel-Leb’s credit facility had been “renew[ed].” But the complaint also alleges that the director defendants had the “motive and opportunity” to commit fraud. In particular, the complaint asserts that the director “[d]efendants were motivated to issue materially false statements ... in large part to maintain the credit facility with Merrill Lynch.” Comp 1145. Such motivations are highly probative of an intent to defraud. Allegations that a company’s life hinges upon a credit facility, and that its lender is growing concerned about the company’s financial state—coupled, as here, with severely overstated financials— present a starkly different scenario than the sort of generalized and commonplace motivations that the majority opinion finds to warrant dismissal under Rule 12(b)(6). The present complaint alleges that (1) absent financial overstatements, a corporation would default on a credit facility necessary to its survival; and (2) anxious lenders are repeatedly stiffening the terms of loan covenants, suggest a more specific and less common motivation and, therefore, are more probative of fraudulent intent.
Several courts have found such allegations probative of scienter. In Howard v. Everex Sys., 228 F.3d 1057 (9th Cir.2000), the court found scienter had been sufficiently established through plaintiffs’ evidence that “Everex had a motivation to overstate its net value so as not to violate *793 loan covenants with its principal lender CIT.” Id. at 1064. Everex’s lender had required it to maintain a net worth of $90 million and at the end of fiscal year 1991, Everex had a net worth of $92.1 million. The court stated that, given Everex’s “projected possible first quarter FY 1992 losses of $2.1 million, resulting in a net worth of exactly $90 million,” the defendant director and CEO “had the incentive to overstate Everex’s value.” Id. The court concluded that “the demonstration of [the defendant’s] possible motive, combined with the red flags of Everex’s financial condition, are sufficient to withstand a motion for JMOL.” Id.[18]
Similarly, in PR Diamonds, Inc. v. Chandler, 364 F.3d 671 (6th Cir.2004), the court found significant the plaintiffs’ allegations that the defendants used improper accounting practices to forestall the company’s impending default under certain financial covenants of its bank loan agreement:
[T]he allegations that the Individual Defendants were motivated to engage in fraud in order to forestall Intrenet’s default of its bank loan agreement and to preserve the Company’s ability to borrow pursuant to its credit facility warrant closer scrutiny. These more particularized sorts of motive allegations are more probative of scienter. For example, as part of the mix of factors contributing to an inference of scienter, the Ninth Circuit has considered a defendant’s motivation to overstate a company’s reported net value so as not to violate loan covenants with its lender and to improve the prospects of increasing its credit line. Howard v. Everex Sys., Inc., 228 F.3d 1057, 1064 (9th Cir.2000). We view the motive allegations concerning the bank loan and credit facility as suggestive of scienter, although standing alone they do not establish a strong inference.
Id. at 690 (emphasis added).
In the present case, the complaint’s allegations that the director defendants were motivated to avoid defaulting on Sel-Leb’s credit facility do not stand alone. Read together with Sel-Leb’s SEC filings, the pleadings show that Merrill Lynch twice within a four-month period tightened Sel-Leb’s loan covenants, the most plausible explanation for which is Merrill Lynch’s concern about Sel-Leb’s financial situation. The director defendants knew of these concerns but did not disclose them; in fact, the complaint alleges that the director defendants hid or “buried” those concerns, see Comp. H 30 (supra n. 3), behind the pretense that the facility was being “renew[ed].” A42.
The question for us is not whether there are benign and “puffery” ways of interpreting these events; there may be many. Rather, the issue is whether plaintiffs have pled facts “rendering an inference of scienter at least as likely as any plausible opposing inference.” Tellabs, 127 S.Ct. 2499, 2513 (2007) (emphasis in original). I would hold that they have met this burden, and have therefore properly and adequately pled the “strong inference” of scienter required under the PSLRA.
I therefore respectfully dissent from the majority’s judgment, which upholds the district court’s dismissal of plaintiffs’ complaint pursuant to Fed.R.Civ.P. 12(b)(6) and thus precludes plaintiffs from proving *794 the fraud and intent of the defendant directors—-which plaintiffs have abundantly and appropriately alleged in the complaint.

. See Oran v. Stafford, 226 F.3d 275, 289 (3d Cir.2000) (adopting the reasoning of "[a] number of our sister circuits [that] ... in deciding a motion for judgment on the pleadings [we may] take judicial notice of properly-authenticated public disclosure documents filed with the SEC); see also Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir.1991).
Moreover, I emphasize that this is a Fed. R.Civ.P. 12(b)(6) proceeding. In reviewing a dismissal for failure to state a claim, a judge must accept as true all of the factual allegations contained in the complaint and may take judicial notice of SEC documents. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., - U.S. -, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007). As the Supreme Court recently noted, "[t]he inquiry ... is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.” Id. (emphasis in original).

. I concur with the majority that the complaint was properly dismissed as to J.H. Cohn, Sel-Leb’s auditor, on the grounds that it stood to gain no "concrete and personal benefit” from such misstatements. GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir.2004); see also Rothman v. Gregor, 220 F.3d 81, 98 (2d Cir.2000) (holding that an auditor may be found liable for recklessness in certifying financial misstatements only if its conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care [and] must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company”).

. It is convenient for the majority opinion to infer that Sel-Leb’s credit line was renegotiated only in the ordinary course of business. See maj op. n. -. This is the same litany that Sel-Leb would have us believe. However, as I point out, what Sel-Leb did was bury its "renewal” to disguise the true purpose and effect of renegotiating its credit with Merrill Lynch. One need only take a cursory look at the modifications made by Merrill Lynch—■ which critically tightened Sel-Leb’s credit (and were instituted not only once, but twice, in a span of four months)—to understand that this was no mere "ordinary course of business.” This was financial desperation!

. The majority opinion could have attempted to further dilute the size of the 400% earnings misstatement by speculating that it resulted from a 4.2% overstatement of revenues and a 4.3% understatement of expenses (both percentages equaling in total to about $1.8 million of the misstated net earnings).

. See also Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir.2000) (agreeing that the magnitude of write-offs involved “renders less credible” defendants' argument that they acted without scienter); In re Baan Co. Sec. Litig., 103 F.Supp.2d 1, 21 (D.D.C.2000) (observing that "the magnitude of the error can play a role” in inferring scienter); In re Ancor Communications, Inc., 22 F.Supp.2d 999, 1005 (D.Minn.1998) (finding support for a strong inference of conscious behavior from a company’s substantial overstatements of revenues); In re First Merchants Acceptance Corp. Sec. Litig., No. 97-C-2715, 1998 WL 781118, at *10, 1998 U.S. Dist. LEXIS 17760, at *30-*31 (N.D.Ill. Nov. 4, 1998) ("Other circumstances suggesting fraudulent intent can include ... the magnitude of the fraud alleged.”); Corley Capital Group v. Deloitte & Touche, L.L.P., 27 F.Supp.2d 1324, 1339 (N.D.Ga.1998) (holding that a misapplication of GAAP "when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter”); Rehm v. Eagle Fin. Corp., 954 F.Supp. 1246, 1255 (D.Ill.1997) (citing the defendants' 91% overstatement of revenues as an "egregious miscalculation of credit losses” indicative of fraudulent intent); Marksman Partners, L.P. v. Chantal Pharm. Corp., 927 F.Supp. 1297, 1314 (D.Cal.1996) ("The facts that the allegedly overstated revenues constituted such a significant portion of Chantal’s total revenues ... tend[s] to support the conclusion that the defendants acted with scienter.”).

. Howard arose in the context of a motion for judgment as a matter of law rather than on a motion to dismiss, in which context the Ninth Circuit has interpreted the PSLRA to discount allegations of motive and opportunity as a means of establishing scienter. See Fischer v. Vantive Corp.(In Re Vantive Corp. Secs. Litig.), 283 F.3d 1079, 1097 (9th Cir.2002).